Filing # 157588060 E-Filed 09/16/2022 02:43:16 PM

**IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT,**
**IN AND FOR COLLIER COUNTY, FLORIDA**
**CIVIL DIVISION**

ENSEMBLE RCM, LLC,

      Plaintiff,

vs.                                Case No. _____

CAREPOINT HEALTH
MANAGEMENT ASSOCIATES, LLC,

      Defendant.

_____/

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, ENSEMBLE RCM, LLC ("Ensemble"), sues Defendant, CAREPOINT HEALTH MANAGEMENT ASSOCIATES, LLC ("CarePoint"), and alleges as follows:

1. This is an action for declaratory judgment pursuant to the Florida Declaratory Judgment Act, section 86.011, *et seq.,* Florida Statutes.

2. Ensemble seeks a declaration that CarePoint released all claims against it arising under a now-terminated services agreement between Ensemble and CarePoint pursuant to a settlement agreement entered into by the parties on September 1, 2020 and that CarePoint therefore cannot assert or recover for any claims pre-dating September 1, 2020, including all claims under the now-terminated services agreement.

3. In the alternative, Ensemble seeks a declaration that any claims against Ensemble under or related to the services agreement must be brought in this Court pursuant to exclusive jurisdiction and venue provisions in the services agreement and settlement agreement rather than in New Jersey, where CarePoint has threatened to sue.

FILED: COLLIER COUNTY, CRYSTAL K. KINZEL, CLERK, 09/16/2022 02:43:16 PM

**Parties, Jurisdiction & Venue**

4.      Plaintiff Ensemble is a limited liability company organized under the laws of Delaware with its principal place of business in Cincinnati, Ohio. It is the successor-in-interest to Executive Revenue Cycle Partners LLC, a limited liability company organized under the laws of Delaware, which had its principal place of business in Naples, Florida.

5.      Defendant CarePoint is a limited liability company organized under the laws of New Jersey with its principal place of business in Hoboken, New Jersey.

6.      This Court has subject matter jurisdiction under Florida Statutes, sections 26.012 and 86.011.

7.      The amount in controversy in this litigation exceeds $30,000.00, exclusive of interest and costs.

8.      This Court has personal jurisdiction over CarePoint because, pursuant to the Master Services Agreement dated July 1, 2014 ("2014 MSA") and Second Confidential Settlement and Release Agreement ("Second Settlement and Release"), CarePoint consented to exclusive jurisdiction in the state and federal Courts of Collier, County, Florida. *See* 2014 MSA § 9.1, attached as **Exhibit A**; Second Settlement and Release § 4, attached as **Exhibit B**.

9.      Venue is likewise proper in this County because the parties mutually consented to exclusive venue herein. *See id.*

**The 2014 Master Services Agreement**

10.     On July 1, 2014, Ensemble (through its predecessor-in-interest, Florida-based Executive Revenue Cycle Partners LLC), entered into a Master Services Agreement (the "2014 MSA") with CarePoint, pursuant to which Ensemble agreed to provide certain revenue cycle services, including patient and insurance claims processing, billing, and payer follow-up services

to three New Jersey hospitals (the "CarePoint Hospitals"). CarePoint operates and manages the CarePoint Hospitals, and all four entities are under common ownership.

11.    The 2014 MSA provides that "[Ensemble] will provide services to [the CarePoint Hospitals] pursuant to one or more Statement(s) of Work ('SOW's')," each of which is "an integral part of [the] MSA." 2014 MSA § 1.1. The MSA "contains the global terms and conditions for all SOW's unless the SOW modifies the terms" of the MSA. *Id.*

12.    The 2014 MSA provides that it "will be construed and controlled by the laws of the state of Florida, without reference to its conflict of law principles, and the parties mutually consent to exclusive jurisdiction and venue in the state and federal courts sitting in Collier County, Florida." *Id.* § 9.1. These choice of law and exclusive jurisdiction and venue provisions "survive termination" of the 2014 MSA. *See id.* § 7.3 (stating that "[t]ermination of this Agreement will not affect Sections 4, 5, 6, 7.3, 8, and 9 of this Agreement, each of which will survive termination of this Agreement, regardless of the reason for termination").

13.    The SOW setting forth the Services to be provided by Ensemble under the 2014 MSA and the fees to be paid therefor from May 3, 2015 until September 1, 2020 was Statement of Work 5 ("SOW 5"). SOW 5 is attached to this Complaint as **Exhibit C**.

**Prior Payment and Services Disputes and the Second Settlement and Release**

14.    In spring 2019—around the same time that the New Jersey Commission of Investigation issued a report detailing how CarePoint's ownership siphoned $157 million from the CarePoint Hospitals in allegedly suspicious management and other fees[1]—CarePoint began defaulting on its payments to Ensemble.

---

[1] *See* https://www.state.nj.us/sci/pdf/HospitalsReport.pdf.

15.     As of May 6, 2019, CarePoint owed Ensemble nearly $3.6 million in past due invoices. After Ensemble gave CarePoint notice of termination for failure to pay, the parties entered into a settlement agreement and payment plan, under which CarePoint agreed to pay the past due invoices. As part of that agreement, Ensemble withdrew its prior notice of termination and continued to provide services under the 2014 MSA and SOW 5.

16.     Following a multi-million dollar global settlement between CarePoint and a major health insurer, CarePoint paid off the balance of the amount outstanding. However, almost immediately thereafter, CarePoint resumed its conduct of repeatedly defaulting on the MSA and SOW 5 by late payment, short payment, or no payment at all.

17.     As a supposed justification or excuse for its refusals to pay, CarePoint asserted a number of purported (but meritless) complaints about the fees, as well as about Ensemble's alleged failure to perform or properly perform certain of its obligations under the 2014 MSA and SOW 5.

18.     On September 30, 2019, CarePoint informed Ensemble that it would not pay the disputed invoices. As a result, Ensemble again gave CarePoint notice that it was terminating the 2014 MSA and SOW 5 for failure to pay, effective October 21, 2019. As of November 13, 2019, CarePoint was over $1.6 million in arrears.

19.     On September 1, 2020, Ensemble and CarePoint entered into the Second Settlement and Release to settle the parties' dispute over CarePoint's nonpayment and its allegations that Ensemble had failed to perform or properly perform its obligations under the 2014 MSA and SOW 5. CarePoint agreed to pay and Ensemble agreed to accept $750,000 to settle the dispute.

20.     Section 3 of the Second Settlement and Release contains a mutual release, which provides, in relevant part:

> Except for CarePoint's obligation to pay the Settlement Amount as set forth in Section 2, above, the Parties (on their own behalf and on behalf of their affiliates

…) do hereby completely release and forever discharge each other and each other's affiliates, … from the beginning of time to the Effective Date [September 1, 2020], of and from any and all demands, liens, actions, causes of action, suits, losses, damages, punitive damages, attorneys' fees and claims, of any nature whatsoever, arising directly or indirectly out of the [2014] MSA (including any SOW), whether arising in law, contract, tort, equity, by statute, or otherwise.

Second Settlement and Release § 3.

21.    The Second Settlement and Release, like the 2014 MSA, provides that it is governed by Florida law. *See id.* § 4.

22.    In the Second Settlement and Release, the parties acknowledge that "the MSA and SOWs were terminated effective October 21, 2019," though they note that Ensemble "continued to perform post-termination services for CarePoint as contemplated in the MSA" between October 2019 and the execution of the Second Settlement and Release in September 2020. *Id.* at Recitals, ¶ F.

23.    The Second Settlement and Release contains a prevailing party attorneys' fees and costs provision for any action to enforce the Agreement. *Id.* § 5.

**The 2020 Master Services Agreement**

24.    The Second Settlement and Release explains that "[t]he Parties desire that Ensemble continue to provide services to each of the three CarePoint Hospitals pursuant to new and separate master service agreements to be entered into between Ensemble and the affiliate owners of each of the CarePoint Hospitals." *Id.* ¶ G.

25.    Consistent with that recitation, on the same day (September 1, 2020), Ensemble entered into materially identical Master Services Agreements with each of the three CarePoint Hospitals. *See, e.g.*, Master Services Agreement dated September 1, 2020 between Ensemble and IJKG Opco LLC d/b/a CarePoint Health – Bayonne Medical Center (the "2020 MSA"), attached as **Exhibit D.**

26.    The 2020 MSA provides that it is governed by Florida law but requires all disputes to be resolved through binding arbitration under the Rules of the American Arbitration Association. *Id.* ¶ 9.16.

## The Present Dispute

27.    On August 26, 2022, the General Counsel for CarePoint sent a letter to the President and CEO of Ensemble alleging an "extreme lack of performance under the MSAs" and threatening to file a lawsuit against Ensemble and to seek injunctive relief. An enclosure to the letter made clear that CarePoint was alleging a lack of performance under the terminated 2014 MSA, breach of the 2014 MSA, and substantial damages and/or restitution of service fees paid under the 2014 MSA dating back to 2017.

28.    Moreover, CarePoint is threatening to bring this suit in the Superior Court of New Jersey in Hudson County, New Jersey, rather than in the state or federal courts of Collier County, Florida, as agreed and required by the 2014 MSA and Second Settlement and Release.

## COUNT I

**(Declaratory Judgment Regarding Claims That are Barred and Released)**

29.    Ensemble incorporates the allegations of paragraphs 1–28 by reference as if fully set forth herein.

30.    This is an action for a declaratory judgment pursuant to §§ 86.011 and 86.021, Florida Statutes.

31.    A dispute has arisen between Ensemble and CarePoint concerning the rights, status, and other equitable or legal relationships between the parties under the Second Settlement and Release and the 2014 MSA (including SOW 5, which is a part of the 2014 MSA).

32. CarePoint contends that Ensemble has breached the 2014 MSA and SOW 5 and is threatening to file suit for damages and/or restitution pursuant to those agreements.

33. As explained above, however, the Second Settlement and Release contains a release by CarePoint of all claims against Ensemble under the 2014 MSA and SOW 5 from the beginning of time until September 1, 2020. *See* Second Settlement and Release § 3. Moreover, the 2014 MSA and SOW 5 were terminated on October 21, 2019, and all services provided from September 1, 2020 onwards have been governed by the 2020 MSAs between Ensemble and the CarePoint Hospitals, not the 2014 MSA or SOW 5. *See id.* at Recitals, ¶ F; 2020 MSA.

34. Accordingly, Ensemble contends that all claims that CarePoint could assert, and all damages it could seek, up until September 1, 2022, including all claims arising under or related to the 2014 MSA and SOW 5, are barred by the release.

35. Unless the Court grants the declaratory relief sought, Ensemble will be forced to incur the time and expense of defending the claims that CarePoint has threatened to pursue relating to the 2014 MSA and SOW 5.

36. As a result, Ensemble is entitled to a declaration that all of CarePoint's claims arising under or related to the 2014 MSA and SOW 5 have been fully and finally released.

## COUNT II

### (Declaratory Judgment Regarding Exclusive Jurisdiction and Venue)

37. Ensemble incorporates the allegations of paragraphs 1–28 by reference as if fully set forth herein.

38. This is an action for a declaratory judgment pursuant to §§ 86.011 and 86.021, Florida Statutes.

39.     A dispute has arisen between Ensemble and CarePoint concerning the rights, status, and other equitable or legal relationships between the parties under the Second Settlement and Release and the 2014 MSA (including SOW 5, which is a part of the 2014 MSA).

40.     CarePoint contends that Ensemble has breached the 2014 MSA and SOW 5 and is threatening to file suit for damages and/or restitution pursuant to those agreements in a court located in New Jersey.

41.     Ensemble contends that the exclusive jurisdiction and venue provisions in the Second Settlement and Release and the 2014 MSA require that any claims under the 2014 MSA and SOW 5 must be brought in this Court.

42.     Unless the Court grants the declaratory relief sought, Ensemble will be forced to incur the time and expense of litigating to obtain the dismissal or transfer of CarePoint's threatened breach of contract action or may lose the benefit of the exclusive jurisdiction and venue provisions.

43.     As a result, Ensemble is entitled to a declaration that CarePoint must bring and litigate any claims against Ensemble under the 2014 MSA and SOW 5 in this Court.

WHEREFORE, Ensemble prays that this Court declare that CarePoint's claims under the 2014 MSA and SOW 5 have been fully and finally released and are barred under the Second Settlement and Release. In the alternative, Ensemble prays that this Court declare that CarePoint must bring and litigate any claims against Ensemble under the 2014 MSA and SOW 5 in this Court. Ensemble also seeks an award of its reasonable attorneys' fees and costs pursuant to Section 9.1 of the 2014 MSA and/or Section 5 of the Second Settlement and Release and that the Court grant such other additional, alternative, coercive, subsequent, or supplemental relief as may be appropriate, necessary, or proper pursuant to §§ 86.011 and 86.061, Florida Statutes or as the Court deems just and equitable.

Respectfully submitted this 16th day of September, 2022.

/s/ *Mark J. Criser*
Dennis P. Waggoner (FBN: 509426)
dennis.waggoner@hwhlaw.com
julie.mcdaniel@hwhlaw.com
Mark J. Criser (FBN: 0141496)
mark.criser@hwhlaw.com
regina.bigness@hwhlaw.com
**HILL, WARD & HENDERSON, P.A.**
101 East Kennedy Boulevard
Tampa, FL 33602
Tel: (813) 221-3900
Fax: (813) 221-2900

Scott Solberg, P.C. (*pro hac vice forthcoming*)
ssolberg@eimerstahl.com
llawes@eimerstahl.com
Daniel D. Birk (*pro hac vice forthcoming*)
dbirk@eimerstahl.com
ssemens@eimerstahl.com
Tel:  (312)660-7666
**EIMER STAHL LLP**
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604

***Attorneys for Plaintiff***

*EXHIBIT A*

# MASTER SERVICES AGREEMENT

This Agreement is entered into as of July 1, 2014 by and between CAREPOINT HEALTH MANAGEMENT ASSOCIATES, LLC (hereinafter referred to as "CAREPOINT") with offices at 10 Exchange Place, Jersey City, NJ 07302, and Executive Revenue Cycle Partners LLC a Delaware Corporation with offices at 7589 Cordoba Circle Naples, FL 34109(hereinafter referred to as "ERCP").

**WHEREAS**, CAREPOINT is a healthcare provider in the business of providing a wide range of healthcare services to patients;

**WHEREAS**, ERCP is engaged in the business of consulting and business services outsourcing for the healthcare industry; and,

**WHEREAS**, ERCP and CAREPOINT believe it is in their mutual interest and is desirous to enter into an agreement whereby CAREPOINT would utilize ERCP's services under the terms and conditions hereinafter provided.

**NOW, THEREFORE**, in consideration of the mutual promises made, the terms and conditions hereunder described and other valuable consideration, the parties agree as follows:

1. **Statement(s) of Work**

    1.1. Provision of Services pursuant to a Statement of Work.    ERCP will provide services to CAREPOINT pursuant to one or more Statement/(s) of Work ("SOW's"), collectively the "Services," each of which shall be an integral part of this agreement, and must be signed by both parties to be effective.   This Master Services Agreement contains the global terms and conditions for all SOW's unless the SOW modifies the terms herein, but does not itself obligate either party to enter into any specific SOW.

2. **ERCP's Duties and Responsibilities**

    2.1. Manner of Performance.  ERCP will provide the Services in a professional and workmanlike manner.  ERCP will have sole discretion and control over the work of all ERCP consultants and employees under this Agreement, and any SOW's, as well as the manner in which it is performed.

3. **CAREPOINT's Duties and Responsibilities**

    3.1. Access to Information and personnel.  CAREPOINT will provide ERCP with appropriate access to; data, information, and CAREPOINT employees as required by ERCP in order to fulfill its obligations under this agreement.  ERCP has provided CAREPOINT with a copy of its standard "Data Request" which may be amended from time to time and CAREPOINT agrees to provide data generally in the form and frequency of the Data Request.  CAREPOINT understands that additional data and information may be requested within the integral SOW's contained herein.

    3.2. Personnel.  CAREPOINT will provide personnel as a resource to perform CAREPOINT's duties and responsibilities contemplated under this Agreement and the SOW's which are an integral part of this agreement.

3.3. Tasks.   Tasks that are not specifically assigned to ERCP will remain CAREPOINT's responsibility and will remain under CAREPOINT's supervision, management and control, even if ERCP assists CAREPOINT in performing such tasks.

## 4.  Relationship of Parties

4.1. Independent Contractors.  Each party will be and act as an independent contractor and not as an agent or partner of, or joint venture with, the other party for any purpose related to this Agreement or the transactions contemplated by this Agreement.  Further, neither party, by virtue of this Agreement will have any right, power or authority to act or create any obligation, expressed or implied, on behalf of the other party.

## 5.  Fees and Payments

5.1. Fees.  ERCP will invoice and CAREPOINT will pay for products and services fully outlined in each SOW that is agreed upon and made part of this Agreement.

5.2. Payments.  Amounts will be payable to ERCP in accordance with the terms specified in each SOW.

5.3. ACH Debit.  To facilitate payment, ERCP will initiate weekly ACH debit entry for outstanding fees with CAREPOINT's bank as set forth in EXHIBIT B.

5.4. Post Termination Obligation.  Following Termination of this Agreement or any related SOW, ERCP will continue to invoice and CAREPOINT will continue to pay ERCP for a period of ninety (90) days for payments, recoveries, replacement costs, or any other SOW contingent payment vehicle each of which are defined in each respective SOW.

This provision (Section 5, Fees and Payments) in its entirety shall survive the termination of this Agreement.

## 6.  Limited Warranty and Limitation of Liability

6.1. ERCP warrants that Services will be performed in a professional and workmanlike manner.

6.2. ERCP makes no other warranties, express, implied, or statutory, regarding or relating to any materials or services furnished or provided to CAREPOINT under this agreement.  ERCP specifically disclaims any and all implied warranties of merchantability and fitness for a particular purpose with respect to said materials and services, and with respect to the use of any of the foregoing.

6.3. In no event will ERCP be liable for any loss of profits, loss of use, business interruption, loss of data, cost of cover, or indirect, special, incidental or consequential damages of any kind in connection with or arising out of this agreement, whether alleged as a breach of contract or tortious conduct, including negligence, even if ERCP has been advised of the possibility of such damages.  In addition, ERCP will not be liable for any damages caused by delay in delivery or

furnishing the services. ERCP liability under any claim arising out of this agreement will not, in any event, exceed the fees paid by CAREPOINT to ERCP under this agreement.

6.4. CAREPOINT will indemnify ERCP against all claims by third parties related to this Agreement. In the event CarePoint properly notifies ERCP of a bankruptcy stay and ERCP violates such bankruptcy stay, ERCP will indemnify CarePoint for its costs associated with such violation.

6.5. No employee, agent, representative or affiliate of ERCP has authority to bind ERCP to any oral representations or warranty concerning the Services or the deliverables that may result from such Services. Any written warranty not expressly contained in this Agreement will not be enforceable.

7. **Term and Termination**

7.1. Term. This Master Service Agreement, the Agreement, shall have an initial term of Three (3) years and six months from July 1, 2014 (the "Initial Term") and shall automatically renew for additional one (1) year terms (each a "Renewal Term") (the Initial Term and Renewal Terms together are the "Master Service Agreement Term") unless terminated pursuant to Section 7.2 below. Each SOW will have a defined term, ("SOW Term") which may be shorter or longer than the Master Service Agreement Term. Each SOW Term will govern said SOW and any SOW Term that extends beyond the Master Service Agreement Term will automatically extend such the Master Service Agreement Term such that it is consistent with that of the SOW.

7.2. Termination.

7.2.1. This Agreement may be terminated at any time by CAREPOINT upon at least ninety (90) days prior written notice of such termination to ERCP upon material breach by ERCP of one or more of its obligations hereunder, unless such breach is cured within sixty (60) days of the notice of termination.

7.2.2. This Agreement may be terminated by ERCP, at any time, if CAREPOINT (i) fails to pay any amount due to ERCP under this Agreement within thirty (30) days after ERCP gives written notice of such non-payment, or (ii) commits a material non-monetary breach of this Agreement, which breach, if capable of being cured, is not cured within sixty (60) days of a written notice of such breach by ERCP.

7.3. Effects of Termination. Termination of this Agreement will not affect Sections 4, 5, 6, 7.3, 8, and 9 of this Agreement, each of which will survive termination of this Agreement, regardless of the reason for termination. In addition to the foregoing, upon any termination, CAREPOINT shall continue to pay ERCP for ERCP's Services according to Section 5, Fees and Payments, of this Agreement.

8. **Confidentiality and Ownership**

8.1. Confidentiality. Each party agrees that all information disclosed to the other party in connection with the performance of this Agreement will remain confidential between ERCP and CAREPOINT. CAREPOINT acknowledges that the rates and methods of ERCP disclosed to CAREPOINT pursuant to this Agreement constitute "Confidential Information" and are not to be disclosed to individuals outside of CAREPOINT. The parties have entered into HIPAA Business Associate Agreements, attached herein as EXHIBIT A.

8.2. Ownership. The parties agree that all information, drawings, documents, designs, models, patents, inventions, copyrightable material and other tangible and intangible materials authored or prepared, in whole or in part, by ERCP in the course of providing the Services, including without limitation computer programs, computer systems, data and documentation, are the sole and exclusive property of ERCP as well as Confidential Information (as such term is defined above) of ERCP and shall not be considered works made for hire.

8.3. Reverse Engineering. CAREPOINT covenants not to modify, disassemble, de-compile, reverse engineer or replicate ERCP and its related entities proprietary software applications.

## 9. General

9.1. Governing Law/Jurisdiction/Attorneys' Fees. This Agreement will be construed and controlled by the laws of the state of Florida, without reference to its conflict of law principles, and the parties mutually consent to exclusive jurisdiction and venue in the state and federal courts sitting in Collier County, Florida. If either party employs attorneys to enforce any rights arising out of or relating to this Agreement, the prevailing party will be entitled to recover its reasonable attorneys' fees, costs, and other expenses, including fees to collect amounts due under this Agreement.

9.2. No Assignment. Neither party may assign or transfer this Agreement or their rights and obligations hereunder, without the prior written consent of the other party, which consent will not be unreasonably withheld. Notwithstanding the foregoing, either party may, without consent, assign this Agreement to a purchaser of substantially all of its business assets or in connection with any merger, consolidation or reorganization of its business.

9.3. Severability. If any provision of this Agreement will be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions will remain in full force and effect.

9.4. No Waiver. No waiver of any breach of any provision of the Agreement will constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver will be effective unless made in writing and signed by an authorized representative of the waiving party. In addition, no terms, provisions or conditions of any purchase order or other business form or written authorization used by CAREPOINT or ERCP will have any effect on the rights, duties or obligations of the parties hereunder or otherwise modify this Agreement, regardless of any failure of ERCP or CAREPOINT to object to such terms, provisions or conditions.

9.5. Force Majeure. Neither party will be responsible for delay or failure in performance resulting from acts beyond its control. Such acts will include, but not be limited to an act of God, an act

of war, riot, an epidemic, fire, flood or other disaster, an act of government, or a strike or lockout.

9.6. Section Headings. The Section headings used in this Agreement are intended for convenience only and will not be deemed to supersede or modify any provisions.

9.7. Entire Agreement. This Agreement (along with any and all exhibits) constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior agreements between the parties. This Agreement will merge all prior and contemporaneous communications. This Agreement will not be modified except by a written agreement dated subsequent to the date of this Agreement and signed on behalf of CAREPOINT and ERCP by their respective duly authorized representatives.

9.8. Notices. Any notices required or permitted to be given hereunder by either party to the other shall be given in writing: (1) by personal delivery; (2) by electronic facsimile with confirmation sent by United States first class registered or certified mail, postage prepaid, return receipt requested; (3) by bonded courier or by a nationally recognized overnight delivery company; or (4) by United States first class registered or certified mail, postage prepaid, return receipt requested, in each case, addressed to the parties as follows, (or to such other addresses as the parties may request in writing by notice given pursuant to this Section):

|  |  |
|---|---|
| If to ERCP: | If to CAREPOINT: |
| **Executive Revenue Cycle Partners, LLC** | **10 Exchange Place, 15th Floor** |
| 7589 Cordoba Circle<br>Naples, FL 34109<br>Tel:610-554-4634<br>Attention: Judson Ivy | **Jersey City, NJ 07090**<br>Tel: 201-821-8701<br>Attention: General Counsel |

Notices shall be deemed received on the earliest of personal delivery, upon delivery by electronic facsimile with confirmation from the transmitting machine that the transmission was completed, twenty-four (24) hours following deposit with a bonded courier or overnight delivery company; or seventy-two (72) hours following deposit in the U.S. Mail as required herein. The foregoing addresses may be changed from time to time by delivering notice of such change to the parties to this Agreement.

9.9. Signatures. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. ERCP and CAREPOINT agree that a facsimile copy of this executed Agreement will have the same force and effect as the original executed document.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives.

CarePoint Health Management Associates, LLC

By:

Name: Gary S. Bryant

Title: Chief Financial Officer

Date: 7/1/14

Executive Revenue Cycle Partners, LLC

By:

Name: Judson Ivy

Title: President & CEO

Date: 7/1/14

EXHIBIT A

## HIPAA BUSINESS ASSOCIATE AGREEMENT

## EXHIBIT B

## AUTHORIZATION AGREEMENT FOR AUTOMATED CLEARING HOUSE ENTRIES

I hereby authorize Executive Revenue Cycle Partners(ERCP) to initiate ACH entry debit, to my
[  ]Checking or [  ]Savings (select one)
account indicated below and the depository bank name below, hereinafter referred to as
"DEPOSITORY," to credit and/or debit the same to my account.

Depository Bank Name _____ __   Branch _____
City _____   State _____   Zip Code _____
Contact Name _____   Phone Number _____

Transit Routing/ABA Number        _____
Account Number            _____
Please attach a blank voided check or a photocopy of a cancelled check.
This authority is to remain in full force and effect until COMPANY has received written notification
from me of its termination in such time and manner as to afford COMPANY and DEPOSITORY a
reasonable opportunity to act upon it.

Name (Print) _____   Title _____
Signature _____   Date _____

This Authorization Agreement is an Exhibit to Master Services Agreement ("MSA") effective July 1,
2014, by and between Executive Revenue Cycle Partners(ERCP) and CAREPOINT, authorizing ERCP
to debit your account each Thursday for the agreed upon Fee applied to the previous week's invoice. If
Thursday is a non-banking business day, then ERCP will debit the account on the next business day.

# *EXHIBIT B*

**SECOND CONFIDENTIAL SETTLEMENT AND RELEASE AGREEMENT**

This Second Confidential Settlement and Release Agreement (the "Agreement") is entered into between Ensemble RCM, LLC ("Ensemble") and CarePoint Health Management Associates, LLC ("CarePoint") (each individually a "Party" and collectively the "Parties") with an effective date of September 1, 2020 (the "Effective Date").

## Recitals

WHEREFORE:

A.  CarePoint and Executive Revenue Cycle Partners LLC ("ERCP") entered into a Master Services Agreement with an effective date of July 1, 2014, which has been amended from time to time (the "MSA"), and several Statements of Work ("SOWs") related thereto, including Statement of Work 5 ("SOW 5"), effective as of August 24, 2015;

B.  CarePoint, through a network of affiliated entities manages three hospitals in Hudson County, New Jersey: Bayonne Medical Center; Christ Hospital; and Hoboken University Medical Center (the three hospitals are hereafter referred to as the "CarePoint Hospitals");

C.  Ensemble is ERCP's successor-in-interest to the MSA and SOWs;

D.  Ensemble performed services for CarePoint under the MSA and SOWs;

E.  CarePoint has disputed certain invoices issued by Ensemble and such disputes remain unresolved;

F.  While the MSA and the SOWs were terminated effective October 21, 2019, Ensemble continued to perform post-termination services for CarePoint as contemplated in the MSA;

G.  The Parties desire that Ensemble continue to provide services to each of the three CarePoint Hospitals pursuant to new and separate master service agreements to be entered into between Ensemble and the affiliate owners of each of the CarePoint Hospitals; and

H.  CarePoint's performance of this Agreement is a condition precedent to Ensemble's performance under the three new and independent master service agreements to be entered between Ensemble and the affiliate owners of three CarePoint Hospitals.

NOW, THEREFORE, the Parties agree as follows:

Terms

### 1. Recitals and Definitions.

The foregoing Recitals are incorporated into and made a part of this Agreement. Unless otherwise defined in this Agreement, all capitalized terms have the meanings specified in the MSA.

### 2. Settlement Payment.

CarePoint will pay Ensemble the amount of Seven-Hundred and Fifty Thousand Dollars ($750,000 USD) no later than September 1, 2020.

### 3. Mutual Release.

Except for CarePoint's obligation to pay the Settlement Amount as set forth in Section 2, above, the Parties (on their own behalf and on behalf of their affiliates and each of their respective officers, directors, shareholders, agents, employees, attorneys, successors and predecessors in interest, beneficiaries, parents, subsidiaries, representatives, divisions and assigns) do hereby completely release and forever discharge each other and each other's affiliates (and their respective officers, directors, shareholders, agents, employees, attorneys, successors and predecessors in interest, beneficiaries, parents, subsidiaries, representatives, divisions and assigns), from the beginning of time to the Effective Date of this Agreement, of and from any and all demands, liens, actions, causes of action, suits, losses, damages, punitive damages, attorneys' fees and claims, of any nature whatsoever, arising directly or indirectly out of the MSA (including any SOW), whether arising in law, contract, tort, equity, by statute, or otherwise. This Agreement contains the entire terms of the settlement agreement between the Parties, and there are no oral or written agreements, representations, or inducements of any kind between the Parties with respect to the settlement that are not contained in this Agreement. This Agreement can be amended only by an instrument in writing and signed by the Party against whom enforcement of any waiver, change, or modification is sought.

### 4. Governing Law, Jurisdiction, and Venue

This Agreement shall be governed by the law of the State of Florida without regard to its choice of law or conflict of law principles. The Parties mutually consent to, and waive any objection to, exclusive jurisdiction and venue in any state court located in Collier County, Florida, or to any federal court that is located in a city that is either in or geographically closest to Collier County, Florida. Notwithstanding any provision in the MSA, the Parties further agree that in any action involving both this Agreement and the MSA, the action may be brought according to the terms of this provision.

2

## 5. Attorneys' Fees and Costs

Each Party shall bear responsibility for its own attorney fees and costs associated with this Agreement. In any action to enforce this Agreement, the prevailing party shall be awarded its reasonable litigation fees and costs (including attorney and expert fees, and including with respect to any appeal).

## 6. Severability

Each provision of this Agreement shall be interpreted so as to be effective and valid under applicable law. If any provision is held to be prohibited by or invalid under applicable law, then that provision shall be ineffective only to the extent of that prohibition or invalidity, and the remaining provisions shall remain in full force and effect.

## 7. Authority

The Parties represent that their officers and agents have been duly authorized to execute this Agreement on their behalf, and that the Parties or their officers and agents have taken all corporate actions necessary to make this Agreement a valid and binding obligation.

## 8. Counterparts

This Agreement may be executed in counterparts, each of which is declared to be an original. In any subsequent action or proceeding, any copy of the Agreement may be introduced into evidence without foundation as to the original.

## 9. Legal Review

This Agreement has been negotiated between unrelated Parties who are sophisticated and knowledgeable and who have acted in their own self-interest. This Agreement has been fully negotiated between the Parties and shall be construed and interpreted as if drafted jointly by each of the Parties to it. Each of the Parties has entered into this Agreement following independent consultation with legal counsel, and this Agreement is a culmination of the coordinated efforts of each Party's legal counsel. Accordingly, any rule of law that requires interpretation of any ambiguities in this Agreement against the party who has drafted it is not applicable and is waived. The provisions of this Agreement shall not be interpreted or construed against any Party.

## 10. Confidentiality

The Parties shall keep the terms and conditions of this Agreement confidential and agree not to disclose its terms to any third parties except (a) their attorneys, accountants, and financial ins"itutions (including lenders); (b) in response to a valid

3

subpoena or court order, (c) as otherwise required by law, or (d) in connection with any proceedings to enforce this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement:

CAREPOINT HEALTH MANAGEMENT
ASSOCIATES, LLC

ENSEMBLE RCM, LLC

By: _____

Print Name: _WILLIAM POTELO_

Title: _CFO_

Date: _8/3/2020_

By: _Shannon White_
Shannon White (Aug 4, 2020 09:13 EDT)

Print Name: _Shannon White_

Title: _President_

Date: _Aug 4, 2020_

4

*EXHIBIT C*

# STATEMENT OF WORK ("SOW") 5 – REVENUE CYCLE MANAGEMENT SERVICES

May 3,

(Pursuant to the Master Services Agreement ("MSA") dated July 1, 2014, as amended on ____, 2015, by and between CarePoint Health Management Associates, LLC d/b/a CarePoint Health (hereinafter referred to as "CAREPOINT"), and Executive Revenue Cycle Partners, LLC., (hereinafter referred to as "ERCP"). . The effective date of this SOW is August 24, 2015 (the "SOW Effective Date").

## AGREEMENT TO REPLACE:

This SOW replaces SOW's # 1-4

## ERCP WILL PROVIDE:

1.  For all CAREPOINT hospitals, ERCP will manage the following Revenue Cycle Management Functions. These functions are specific to hospital revenue cycle functions and are not inclusive of physician nor professional services.

    See exhibit A (Roles and Responsibilities)

2.  ERCP will provide the following positions to CAREPOINT either via direct employment with ERCP or contracted services with ERCP as part of the management agreement with CAREPOINT

    (1) Corporate VP Revenue Cycle
    (1) Sr Director of Revenue Cycle
    (1) AVP, Revenue Cycle Physician Revenue Cycle
    (1) Manager Financial Reporting
    (1) VP of Managed Care
    (2) Appeals RN's/LPN's
    (1)Training and Documentation Manager
    (1) Denial Attorney
    (1) Market Director of Patient Access
    (1) Senior Director of Physician Revenue Cycle
    (3) Hospital On-Site Director

3. ERCP will manage existing vendors that CAREPOINT has contracted with to perform other work functions e.g. Transfer DRG, Medicare Bad Debt, Medicaid eligibility

   *CAREPOINT will be responsible for all **expenses related to all outside vendor expenses including but not limited to:**

   HIS System Vendor (Meditech)
   Billing Software Vendor
   AR Workflow and Dashboard
   Medicare DDE/FISS Connections
   Statement Vendor
   Primary Medicaid Eligibility Vendor
   Medicaid eligibility scrubbing vendor (Escan)
   Transfer DRG(IMA)
   Insurance Eligibility (Passport)
   Registration QA
   CDM Management (PPS)

   Any expenses for a vendor or solution that is outlined in section 3 of this agreement that is paid by ERCP, shall be passed through at cost on the monthly invoice to CAREPOINT

4. ERCP will prepare and present monthly operating reviews (MOR's). ERCP will also design and implement a denials management process and reporting structure.

## CAREPOINT WILL PROVIDE:

1. Data in the form and frequency consistent with the ERCP standard data specification including electronic 837 and 835 files sent to and received from electronic payors respectively.

2. Remote Access to CAREPOINT's electronic billing applications, MEDITECH Patient Accounting Systems, and all third party payor portals.

3. Make available IT Resources within a timely manner to assist with
   a. System issues and connectivity issues
   b. data integrity issues
   c. data and reports needed for financial analysis and results reporting

4. Designated contacts in the following functional areas that will act as CAREPOINT executive sponsor to assist in carrying out recommended and required revenue cycle functions:
   a. Health Information Management
   b. Utilization/Care Management
   c. Information Technology
   d. All Ancillary Revenue Generating Departments
   e. All CNO/CNE
   f. CEO
   g. CFO
   h. Medical Director
5. CAREPOINT will make every effort to ensure that request from ERCP that pertain to: charge capture, DNFB, denials, collections, compliance regulatory matters, physician and patient satisfaction to within 24 hours.
6. CAREPOINT will ensure attendance from requested parties for monthly operating reviews and monthly denial management meetings
7. CAREPOINT will make available a dedicated contact for compliance in addition to make available all compliance training and material to ERCP.
8. CAREPOINT will be responsible for all policy and procedure approval
9. CAREPOINT will be responsible for determining pricing and pricing strategy
10. Make available and deliver to ERCP all Explanation of Benefits (EOBs) received at the following location in electronic format:
    a. Bank lockbox
    b. Mailed directly to Hospital

11. CAREPOINT will provide resources for all state data reporting

## SOW 5 TERM:

1. Subject to the rights of either Party pursuant to Section 7.1 of the Master Services Agreement, the Initial Term of this SOW 5 is Five (5) years from August 25, 2105 hereafter referred to as the "SOW 5 Effective Date" and will continue on an annual basis thereafter unless terminated.

## SOW 5 FEE STRUCTURE:

1. CAREPOINT will pay ERCP a monthly management fee of two hundred eighty one thousand dollars ($281,000) per month.

2.  CAREPOINT will pay ERCP  3.5% of all patient cash receipts received.  Patient cash receipts are defined as: cash receipts related to a patient account either directly posted to a patient account, posted to GL, or settlement account related to patient accounts. Non-patient cash is defined as: rent, foundation cash, payment for medical records, vendor refunds, interest, DSH, property tax refunds and those payments that are not related to patient accounts receivable.

3.  CAREPOINT will reimburse all travel, lodging, and reasonable business expenses

4.  Any requested changes to the number of positions provided to CAREPOINT or it's affiliates or changes requested to the scope of the management services outlined in exhibit A may result in a change of the monthly management fee.

5. Fees will be invoiced on a weekly basis, and are payable upon receipt of invoice

**IN WITNESS WHEREOF**, the parties have executed this SOW 5 as of the date of CAREPOINT's Signature below.

**CarePoint Health Management Associates, LLC d/b/a CarePoint Health**

Gary S. Bryant (May 3, 2015)

Signature

Gary S. Bryant

Name

EVP & CFO

Title

May 3, 2015

Date

**Executive Revenue Cycle Partners, LLC**

Judson Ivy (May 3, 2015)

Signature

Judson Ivy

Name

Managing Partner

Title

May 3, 2015

Date

*EXHIBIT D*



**MASTER SERVICES AGREEMENT**

This Master Services Agreement (the "MSA") is effective as of September 1, 2020, (the "Effective Date") by and between **Ensemble RCM, LLC d/b/a Ensemble Health Partners** ("Ensemble"), located at 11511 Reed Hartman Hwy, Blue Ash, OH 45241, and **IJKG Opco LLC d/b/a CarePoint Health - Bayonne Medical Center** ("Client"), with an address at 308 Willow Street, Hoboken, NJ 07030.   Ensemble and Client are referred to individually as a "Party", and collectively as the "Parties."

WHEREAS, Client is a healthcare provider in the business of providing a wide range of healthcare services to patients;

WHEREAS, Ensemble is engaged in the business of consulting and business services outsourcing for the healthcare industry; and

WHEREAS, Ensemble and Client believe it is in their mutual interest and is desirous to enter into an agreement whereby Client would utilize Ensemble's services under the terms and conditions hereinafter provided.

NOW, THEREFORE, in consideration of the mutual promises made, the terms and conditions hereunder described and other valuable consideration, the Parties agree as follows:

1. STATEMENT(S) OF WORK.

1.1. Provision of Services pursuant to a Statement of Work. Ensemble will provide services to Client pursuant to one or more Statement(s) of Work ("SOW's"), collectively the "Services," each of which shall be an integral part of this MSA, and must be signed by both Parties to be effective. The MSA contains the global terms and conditions for all SOW's unless the SOW modifies the terms herein, but does not itself obligate either Party to enter into any specific SOW.

2. ENSEMBLE'S DUTIES AND RESPONSIBILITIES.

2.1. Manner of Performance. Ensemble will provide the Services in a professional and workmanlike manner.  Ensemble will have sole discretion and control over the work of all Ensemble consultants and employees under this MSA, and any SOW's, as well as the manner in which it is performed, subject to the terms contained herein. The Services shall comply at all times with all applicable laws and regulations and shall permit Client at all times to comply with applicable laws and regulations.  Client shall perform its obligations and exercise its rights in accordance with applicable laws and regulations.

2.2. Personnel.  With respect to personnel provided by Ensemble to perform the Services, in the event that Client reasonably requests in writing that Ensemble not assign a particular person to Client's account and/or that Ensemble re-assign a particular person away from Client's account, Ensemble will grant that request and replace such person as soon as practicable with a replacement person reasonably acceptable to Client.

3. CLIENT'S DUTIES AND RESPONSIBILITIES.

3.1. Access to Information and personnel.  Client will provide Ensemble with appropriate access to data, information, and Client employees as reasonably required by Ensemble and as permitted by law in order to fulfill its obligations under this MSA.  Client shall use commercially reasonable efforts to provide the data specified in the "Data Specification" worksheet attached as Exhibit B and in the format specified in such Data Specification.   The Parties agree that the Data Specification may be amended from time to time and Client agrees to use commercially reasonable efforts to provide data generally in the form and frequency of the Data Specification.  Client understands that additional data and information may be requested within the integral SOW's contained  herein.

1

**ENSEMBLE**
HEALTH PARTNERS

MASTER SERVICES AGREEMENT

3.2. Personnel.   Client will provide personnel as a resource to perform Client's duties and responsibilities contemplated under the MSA and the SOW's which are an integral part of the MSA.

3.3. Tasks. Tasks that are not specifically assigned to Ensemble will remain Client's responsibility and will remain under Client's supervision, management and control, even if Ensemble assists Client in performing such tasks.

## 4. RELATIONSHIP OF PARTIES.

4.1. Independent Contractors. Each Party will be and act as an independent contractor and not as an agent or partner of, or joint venture with, the other Party for any purpose related to the MSA or the transactions contemplated by this MSA. Further, neither Party, by virtue of this MSA will have any right, power or authority to act or create any obligation, expressed or implied, on behalf of the other Party.

## 5. FEES AND PAYMENTS.

5.1. Fees. Ensemble will invoice and Client will pay for products and services fully outlined in each SOW that is agreed upon and made part of this MSA.

5.2. Payments. Amounts will be payable to Ensemble in accordance with the terms specified in each SOW.

This provision (Section 5, Fees and Payments) in its entirety shall survive the termination of the MSA.

## 6. LIMITED WARRANTY AND LIMITATION OF LIABILITY.

6.1. Ensemble warrants that Services will be performed in a professional and workmanlike manner.

6.2. Ensemble makes no other warranties, express, implied, or statutory, regarding or relating to any materials or services furnished or provided to Client under this MSA. Ensemble specifically disclaims any and all implied warranties of merchantability and fitness for a particular purpose with respect to said materials and services, and with respect to the use of any of the foregoing.

6.3. In no event will either Party be liable for any loss of profits, loss of use, business interruption, loss of data, cost of cover, or indirect, special, incidental or consequential damages of any kind in  connection with or arising out of this MSA, whether alleged as a breach of contract or tortious conduct, including negligence, even if such Party has been advised of the possibility of such damages. Neither Party's liability under any claim arising out of the MSA will, in any event, exceed the fees paid by Client to Ensemble under the MSA.

6.4. Client will indemnify Ensemble against all claims by third parties related to the MSA that arise out of Client's actions or omissions, except to the extent such claim arises as a result of Ensemble's acts or omissions. Ensemble will indemnify Client against all claims by third parties employed by or contracted with Ensemble related to the MSA, except to the extent such claim arises as a result of Client's acts or omissions. In the event Client properly notifies Ensemble of a bankruptcy stay and Ensemble violates such bankruptcy stay, Ensemble will indemnify Client for its costs associated with such violation.

6.5. No employee, agent, representative or affiliate of Ensemble has authority to bind Ensemble to any oral representations or warranty concerning the Services or deliverables that may result from such Services. Any written warranty not expressly contained in the MSA will not be enforceable.

## 7. TERM AND TERMINATION.

2



7.1. Term. The term of this MSA shall commence on the Effective Date and shall continue in effect until 90 days after the expiration or termination of all SOWs under this MSA (the "Term") unless sooner terminated pursuant to Section 7.2 of the MSA. The Parties may agree to extend the Term of the MSA in a writing signed by both Parties. Client hereby grants to Ensemble, subject to the terms and conditions of the MSA, the sole and exclusive right to provide the Services agreed herein during the Term for each Service that has a SOW then in effect. Each SOW will have a defined term ("SOW Term").

7.2. Termination.

7.2.1. The MSA may be terminated at any time by Client for cause upon at least ninety (90) days prior written notice of such termination to Ensemble upon material breach by Ensemble of one or more of its obligations hereunder and/or under any SOW, unless such breach is cured within sixty (60) days of the notice of termination.  Client may also terminate this MSA for cause in accordance with the terms of the BAA.

7.2.2. The MSA may be terminated by Ensemble, at any time, if Client (i) fails to pay any undisputed amount when due and fails to cure such breach within  seven (7) days after Ensemble gives written notice of such non- payment, or (ii) commits a material non-monetary breach of this MSA, which breach, if capable of  being cured, is not cured within ninety (90) days of a written notice of such breach by Ensemble.

7.2.3. Either Party may, with or without cause, terminate the MSA at any time upon at least seventeen (17) weeks' prior written notice of such termination to the other Party.

7.2.4 The Parties acknowledge that Ensemble is entering into substantially similar Master Services Agreements (each, a "Client Affiliate MSA") with each of HUMC Opco LLC d/b/a CarePoint Health – Hoboken University Med'cal Center and Hudson Hospital Opco, LLC d/b/a CarePoint Health – Christ Hospital (each, a "Client Affiliate").  In the event that Ensemble or a Client Affiliate terminates a Client Affiliate MSA for cause, Ensemble or Client (as applicable) may, at its option but not obligation, immediately terminate this MSA for cause upon written notice to the other party.

7.3 Effects of Termination.  Termination of the MSA will not affect Sections 4, 5, 6, 7.3, 8, and 9 of this MSA, each of which will survive termination of the MSA, regardless of the reason for termination. In addition to the foregoing, upon any termination, Client shall continue to pay Ensemble for Ensemble's Services according to Section 5, Fees and Payments, of the MSA.  Furthermore, Ensemble shall provide to Client, at no further charge and on the termination date, any information held in the possession of Ensemble relating to Client of which Client does not already have a copy.  Such information shall be provided in an industry standard format.

7.4 Termination Assistance.

7.4.1 Commencing upon any notice of termination or of non-renewal of the MSA or any SOW and continuing through the effective date or expiration or termination thereof, Ensemble will provide to Client, termination assistance, at Client's option, as mutually agreed upon between the Parties negotiating in good faith, to allow the services to continue without interruption or adverse effect and to facilitate the orderly migration and transfer of the services to Client ("Termination Assistance"). To the extent Ensemble is to provide Termination Assistance pursuant to the preceding sentence, all the provisions of the MSA and the applicable SOW will be applicable as such provisions would have been applicable to the services prior to the date of termination or

3

**ENSEMBLE**
HEALTH PARTNERS                                              MASTER SERVICES AGREEMENT

expiration.

7.4.2    For a period of six (6) months, or such other extended period as the Parties may mutually agree upon, following the date of termination or expiration of the MSA or any SOW, if later, Ensemble will provide, at Client's written request, any or all of the services being performed by Ensemble pursuant to such SOW prior to such date, including Termination Assistance. To the extent Ensemble is to perform services pursuant to the preceding sentence, all the provisions of the MSA and the applicable SOW will be applicable as such provisions would have been applicable to the services prior to the date of termination or expiration.

7.4.3    If Ensemble terminates the MSA or any SOW in accordance with Section 7.2.2 as a result of Client's failure to pay, Ensemble may require pre-payment for any services provided in accordance with this section.  To the extent pricing in an SOW is contingent, such pre-payment shall be based on estimates developed in accordance with Client's historical volumes for the six-month period preceding the effective date of termination and such payments shall be reconciled to Client's actual volumes upon the cessation of the services.  If Client terminates a SOW for convenience and incurs a fee in connection with such termination, Ensemble's obligation to provide the services specified in this Section 7 shall be subject to Client's payment of such fee.

8.  **CONFIDENTIALITY AND OWNERSHIP.**

8.1. Confidentiality. Each Party agrees that all information disclosed to the other Party in connection with the performance of the MSA will remain confidential between Ensemble and Client. Client acknowledges that the rates and methods of Ensemble disclosed to Client pursuant to the MSA constitute "Confidential Information" and are not to be disclosed to individuals outside of Client. The Parties have entered into the HIPAA Business Associate Agreement, attached herein as Exhibit A (the "BAA").

8.2. Ownership. The Parties agree that all information, drawings, documents, designs, models, patents, inventions, copyrightable material and other tangible and intangible materials authored or prepared, in whole or in part, by Ensemble in the course of providing the Services, including without limitation computer programs, computer systems, data and documentation (excluding Client's data and the data of Client's patients and any data, documents, drawings, designs, models, patents, inventions, programs, systems and materials which are derived from any such data), are the sole and exclusive property of Ensemble as well as Confidential Information (as such term is defined above) of Ensemble and shall not be considered works made for hire.

8.3. Reverse Engineering. Client covenants not to modify, disassemble, de-compile, reverse engineer or replicate Ensemble and its related entities proprietary software applications.

9.  **GENERAL.**

9.1. Governing Law/Jurisdiction/Attorney's Fees. The MSA will be construed and controlled by the laws of the State of Florida, without reference to its conflict of law principles.

9.2. Assignment.  Neither Party shall assign the MSA, any SOW or any portion thereof, including by merger, consolidation, dissolution, operation of law, or any other manner ("Transaction"), without the prior written consent of the other Party. Any purported assignment of the MSA or any SOW or any parts thereof in violation of the MSA shall be void and of no effect. Any permitted assignee shall assume all obligations of its assignor under the MSA and any applicable SOW. Provided however, in the event of a Transaction of Client,

4

 **ENSEMBLE**
HEALTH PARTNERS

MASTER SERVICES AGREEMENT

each Party has the right to terminate the MSA and all SOW's, without cause, upon one hundred twenty (120) days' notice to the other Party.

9.3. Severability. If any provision of the MSA will be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provision will remain in full force and effect.

9.4. No Waiver. No waiver of any breach of the MSA will constitute a waiver of any prior, concurrent or subsequent breach of the same or any provisions hereof, and no waiver will be effective unless made in writing and signed by an authorized representative of the waiving party. In addition, no terms, provisions or conditions of any purchase order or other business form or written authorization used by Client or Ensemble will have any effect on the rights, duties or obligations of the Parties hereunder or otherwise modify the MSA, regardless of any failure of Ensemble or Client to object to such terms, provisions or conditions.

9.5. Force Majeure. Neither Party will be responsible for delay or failure in performance resulting from acts beyond its control. Such acts will include, but not be limited to an act of God, an act of war, riot, an epidemic, fire, flood or other disaster, an act of government, or a strike or lockout. In the event that Ensemble declares a force majeure event and, consequently, ceases to provide any or all of the Services for a period exceeding three business days, Client shall have the right to terminate this MSA immediately for any or all of the Services upon written notice to Ensemble and utilize another party to provide any or all of the Services.

9.6. Section Headings. The Section headings used in the MSA are intended for convenience only and will not be deemed to supersede or modify any provisions.

9.7. Entire Agreement. The MSA (along with any and all exhibits) constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes any prior agreements between the Parties, including the Master Services Agreement (as amended) between the Parties (or their predecessors in interest or affiliate including, without limitation, CarePoint Health Management Associates, LLC ("CHMA")) effective June 1, 2014 and all exhibits and SOWs thereto. The MSA will not be modified except by a written agreement dated subsequent to the date of this MSA and signed on behalf of Client and Ensemble by their respective duly authorized representatives. For clarity, this MSA does not amend, supersede or replace the Confidential Settlement Agreement between Ensemble and CHMA effective May 6, 2019.

9.8. Notices. Any notices required or permitted to be given hereunder by either Party to the other shall be given in writing: (1) by personal delivery; (2) by electronic facsimile with confirmation sent by United States first class registered or certified mail, postage prepaid, return receipt requested; (3) by bonded courier or by a nationally recognized overnight delivery company; or (4) by United States first class registered or certified mail, postage prepaid, return receipt requested, in each case, addressed to the Parties as follows, (or to such other addresses as the Parties may request in writing by notice given pursuant to this Section):

| Ensemble Health Partners | IJKG Opco LLC d/b/a CarePoint Health - Bayonne Medical Center |
|---|---|
| 11511 Reed Hartman Hwy | 308 Willow Street |
| Blue Ash, OH 45241 | Hoboken, NJ 07030 |
| Attn: Judson Ivy, CEO | Attn: Chief Financial Officer |

9.9. Signatures. The MSA may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. Ensemble and Client agree that a facsimile copy or a

5


**ENSEMBLE**
HEALTH PARTNERS

pdf copy of this executed MSA will have the same force and effect as the original executed document.

9.10. Non-Solicitation. During the term of the MSA and for a period of twelve (12) months following termination of the MSA, neither Party will, without the prior written consent of the other Party, either directly or indirectly, solicit or attempt to solicit, divert or hire away any person employed by the other Party.

9.11. Independent Contractor. Ensemble is an independent contractor of Client and, except as expressly set forth herein, at no time will Ensemble make commitments or incur any charges or expenses for, or in the name of, Client without the written consent of Client.

9.12. Amendments; Modifications. Neither the MSA or any SOW may be amended or modified except in a writing duly executed by authorized representatives of each of the Parties.

9.13. Exclusions. Ensemble warrants that it is not currently listed by a Federal agency as excluded, debarred, or otherwise ineligible for participation in any Federal health care program. Ensemble agrees that it will not employ, contract with, or otherwise use the services of any individual whom it knows or should have known, after reasonable inquiry, (i) has been convicted of a criminal offense related to health care (unless the individual has been reinstated to participation in Medicare and all other Federal health care programs after being excluded because of the conviction), or (ii) is currently listed by a Federal agency as excluded, debarred, or otherwise ineligible for participation in any Federal health care program. Ensemble agrees that it will immediately notify Client in the event that it, or any person in its employ, has been excluded, debarred, or has otherwise become ineligible for participation in any Federal health care program. Ensemble agrees to continue to make reasonable inquiry regarding the status of its employees and independent contractors on a regular basis by reviewing the General Services Administration's List of Parties Excluded from Federal Programs and the HHS/OIG List of Excluded Individuals/Entities.

9.14. Insurance. Ensemble shall maintain worker's compensation insurance in the amount required pursuant to applicable state laws and comprehensive general liability insurance in the minimum amount of $3,000,000 per occurrence and $5,000,000 aggregate. Ensemble further agrees to maintain such insurance with the above stated coverage limits during the term of the MSA and shall provide Client with the applicable Certificates of Insurance evidencing such coverage upon request. Ensemble also shall provide Client with not less than thirty (30) days written notice prior to the cancellation or expiration of any insurance policy required to be maintained pursuant to this MSA.

9.15. Order of Precedence. In the event of any conflict between the terms of the MSA or any SOW, the terms of the SOW shall prevail.

9.16. Arbitration. If there is a dispute between the Parties and the dispute is not settled by mutual agreement between the Parties, then the Parties shall submit the matter to arbitration pursuant to the commercial arbitration rules of the American Arbitration Association ("AAA"). The arbitration shall be conducted by a single arbitrator appointed pursuant to the AAA rules. The decision of the arbitrator as to any matter submitted to arbitration shall be final, conclusive and binding on the Parties. The arbitrator will be instructed to prepare and deliver a written, reasoned opinion stating his or her decision within thirty (30) days after the completion of the arbitration. If either Party employs attorneys to enforce any rights arising out of or relating to the MSA, the prevailing Party will be entitled to recover its reasonable attorneys' fees. Notwithstanding the foregoing, for any violation of a Party's intellectual property rights or disclosure or misuse of a Party's confidential information, that Party may seek injunctive relief from a court of law. The Parties shall equally bear the cost and expense of the arbitrator appointed.

6

 **ENSEMBLE**
HEALTH PARTNERS

**MASTER SERVICES AGREEMENT**

IN WITNESS, HEREOF, the Parties have executed this MSA as of the date last written below.

Ensemble RCM, LLC d/b/a Ensemble Health Partners

*Shannon White*
By: Shannon White (Aug 4, 2020 09:10 EDT)

Name: Shannon White

Title: President

Date: Aug 4, 2020

IJKG Opco LLC d/b/a CarePoint Health - Bayonne Medical Center

By: _William_

Name: WILLIAM POLRO

Title: CFO

Date: 8/3/2020

7

**ENSEMBLE**
HEALTH PARTNERS

MASTER SERVICES AGREEMENT

<u>Exhibit A</u>

<u>HIPAA Business Associate Agreement</u>

*See attached.*

 **ENSEMBLE**
HEALTH PARTNERS

MASTER SERVICES AGREEMENT

Exhibit B

Data Specification


Exhibit B (Acute
Data Spec).xlsx

9